Booker PERRY, James Jackson, Stacy McLean, Terry Hawkins, Robson Suarez, and Juan Baquero, Plaintiffs,

v.

ORANGE COUNTY and Orange County Professional Fire Fighters Local 2057, International Association of Fire Fighters, Defendants.

No. 6:01–CV–208ORL22KRS.

United States District Court, M.D. Florida, Orlando Division.

Aug. 27, 2004.

Thomas J. Pilacek, Thomas J. Pilacek & Associates, Winter Springs, FL, for Plaintiffs.

Kevin W. Shaughnessy, Akerman Senterfitt, Orlando, FL, for Orange County.

Joseph Egan, Jr., Egan, Lev & Siwica, P.A., Orlando, FL, for Local 2057.

## ORDER

CONWAY, District Judge.

This cause comes before the Court for consideration of Magistrate Judge James G. Glazebrook's Report and Recommendation ("R & R") (Doc. 190), filed on May 6, 2004. Therein, Judge Glazebrook recommends that all but one of the Plaintiffs be ordered to pay Defendant Orange County $177,071.00 in attorneys' fees, paralegal fees and expert witness costs,[1] and that all Plaintiffs be required to pay Defendant Orange County Professional Fire Fighters, Local 2057, $93,743.50 in attorneys' fees. Judge Glazebrook further recommends denial of Orange County's motion for sanc-

tions against Plaintiffs' counsel pursuant to 28 U.S.C. § 1927 and the Court's inherent power.

After initially reviewing the R & R, the Court issued an Order (Doc. 202) requiring Plaintiffs' current and former attorneys to show cause why they should not be sanctioned pursuant to Fed.R.Civ.P. 11 for conduct specified in the Order. Counsel have filed their Response (Doc. 208) to the show-cause order, as well as supporting affidavits.

After carefully examining the R & R, Plaintiffs' objections thereto, the Defendants' responses to those objections, and the remainder of the record, the Court agrees entirely with the analysis set forth in Magistrate Judge Glazebrook's detailed and comprehensive R & R, including his bottom-line conclusion that "[t]his case is so lacking in arguable merit as to be groundless or without foundation." Doc. 190 at 19. The Plaintiffs' objections to the R & R are without merit. Accordingly, the Defendants are entitled to the monetary awards specified in the R & R.

Additionally, the Court has carefully reviewed the Plaintiffs' attorneys' response to the show cause order, their detailed affidavits, and the attachments to those affidavits, for the purpose of determining whether Rule 11 sanctions should be imposed against them, personally. In conducting this inquiry, the Court is mindful that because no "safe harbor" correction opportunity exists when a court-initiates Rule 11 sanctions proceedings, it must apply "a higher standard ... than in the case of party-initiated sanctions." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir.2003). Specifically, sanctions cannot be imposed in these circumstances unless counsel has engaged in con-

---

1. The County is not seeking an award against James Jackson because his claims against the County were previously dismissed with preju-

dice pursuant to Fed.R.Civ.P. 41(a). *See* Doc. 200 at 2 n. 1.

duct "akin to contempt." *Id.* at 1255–56. This standard is not satisfied in the present case. While some of Plaintiffs' counsel's positions and decisions were certainly ill-considered, they do not rise to the level of conduct tantamount to contempt. In any event, based on the language of Rule 11(c)(2), it appears the Court could not require the attorneys to share responsibility for the payment of the Defendants' fees and expenses even if the Court found a violation of the Rule, since sanctions imposed in the absence of a motion appear to be limited to "directives of a nonmonetary nature" or "an order to pay a penalty into court." Fed.R.Civ.P. 11(c)(2); *see also Nuwesra v. Merrill Lynch, Fenner & Smith, Inc.,* 174 F.3d 87, 94 (2nd Cir.1999) (stating that Rule 11 does not permit a court to award attorneys' fees on its own initiative).

Hence, although the Court believes notions of fairness require Plaintiffs' counsel to share responsibility for at least some of the reimbursement their clients must now make to the Defendants, Rule 11 does not empower the Court to enter an order accomplishing that objective.

Based on the foregoing, it is ORDERED as follows:

1. The Magistrate Judge's Report and Recommendation (Doc. 190), filed May 6, 2004, is APPROVED AND ADOPTED.

2. The Plaintiffs' Objections to the Report and Recommendation of the Magistrate Judge Regarding Attorneys' Fees (Doc. 194), filed May 21, 2004, are OVERRULED.

3. Defendant Orange County's Renewed Motion for Attorney's Fees and for Sanctions (Doc. 173), filed January 27, 2004, is GRANTED IN PART AND DENIED IN PART.

The Motion is GRANTED insofar as it seeks an award of attorneys' fees, parale-gal fees and expert witness costs against all Plaintiffs except James Jackson.

The Motion is DENIED insofar as it seeks an award against Plaintiffs' counsel.

4. Defendant Local 2057's Renewed Motion for Attorney's Fees and Costs (Doc. 170), filed January 20, 2004, is GRANTED.

5. The Clerk shall enter a judgment providing as follows:

Plaintiffs Booker Perry, Stacy McLean, Terry Hawkins, Robson Suarez and Juan Baquero, jointly and severally, shall pay to Defendant Orange County, Florida the sum of $177,071.00 in attorneys' fees, paralegal fees, and expert witness costs; and

Plaintiffs Booker Perry, James Jackson, Stacy McLean, Terry Hawkins, Robert Suarez and Juan Baquero, jointly and severally, shall pay to Defendant Orange County Professional Fire Fighters Local 2057, International Association of Fire Fighters, the sum of $93,743.50 in attorneys' fees.

REPORT AND RECOMMENDATION

GLAZEBROOK, United States Magistrate Judge.

## TO THE UNITED STATES DISTRICT COURT

This cause came on for hearing on February 26, 2004 on the following motions:

MOTION: RENEWED MOTION OF DEFENDANT, ORANGE COUNTY, FLORIDA, FOR ATTORNEYS' FEES AND FOR SANCTIONS (Doc. No. 173)

FILED: January 27, 2004

THEREON it is RECOMMENDED that the motion be GRANTED in part and DENIED in part.

MOTION: DEFENDANT, LOCAL 2057'S, AMENDED RENEWED

MOTION FOR ATTORNEY'S FEES AND COSTS (Doc. No. 175) FILED: January 29, 2004 THEREON it is RECOMMENDED that the motion be GRANTED.

## I. *BACKGROUND*

On February 15, 2001, plaintiffs commenced this action against defendants Orange County and Orange County Professional Fire Fighters Local 2057 (the "Union") for employment discrimination pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 2000(e) et seq. Plaintiffs' four-count complaint alleged (Count I) disparate treatment in violation of Sec.1981; (Count II) disparate treatment pursuant to Title VII; (Count III) disparate impact in contravention of Title VII; and (Count IV) retaliation under Title VII. Doc. No. 1. The allegations in the complaint arise out of a promotional exam ("lieutenant's exam") administered in 1999 for the position of Operations/Fire Lieutenant.

On September 4, 2002, the Honorable Anne C. Conway granted defendants' motions for summary judgment as to all counts not previously dismissed.[1] Doc. No. 129. The Clerk entered judgment in favor of the defendants and directed that they shall recover their costs. Docket No. 130. The United States Court of Appeals for the Eleventh Circuit subsequently affirmed the Court's decision in its entirety. Docket No. 168.

Orange County seeks to recover its attorneys' fees and expert fees from the plaintiffs and their counsel under 42 U.S.C. § 2000e–5(k), 28 U.S.C. § 1927, and this Court's inherent power. The Union seeks attorneys' fees pursuant to 42 U.S.C. § 2000e–5(k) and 42 U.S.C. § 1988. For the reasons detailed below, the undersigned RECOMMENDS that Orange County's motion [Docket No. 173] for attorneys' fees and sanctions be GRANTED in part and DENIED in part, and that the Union's motion for attorneys' fees and costs [Docket No. 175] be GRANTED.

## II. *THE LAW*

### A. Attorney's Fee Provisions—Title VII and 42 U.S.C. § 1988

The United States Congress has determined that a court, in its discretion, may award reasonable attorneys' fees, including expert fees, under Title VII and under § 1988 to a prevailing party as part of its costs. *See* 42 U.S.C. § 2000e–5 (k); 42 U.S.C. § 1988(b); *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 416, 421—22, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). Entitlement to attorneys' fees by a prevailing party under Title VII is governed by the United States Code, which provides:

> In any action or proceeding under this subsection, the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (*including expert fees* ) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

42 U.S.C. § 2000e–5 (k) (emphasis supplied). Similarly, § 1988(b) provides in relevant part:

---

1. Plaintiffs initially named Orange County in Counts I, II, and III of the complaint. However, on June 25, 2002, the Honorable Anne C. Conway granted a motion brought by plaintiffs and Orange County to dismiss with prejudice Counts I and II. Docket No. 80. In addition, on June 28, 2002, plaintiff Jackson moved to dismiss with prejudice all claims by Jackson against Orange County. Docket No. 82. This motion was subsequently granted. Docket No. 129. As to both motions, the parties stipulated that each party would bear its own attorney's fees and costs.

In any action or proceeding to enforce ... [42 U.S.C. § 1983] ... the court, in its discretion, may allow the prevailing party ..., a reasonable attorney's fee as part of the costs.

42 U.S.C. § 1988(b). Congress specifically drew the language of § 1988(b) from preexisting fee provisions like those in Title VII (*i.e.*, § 2000e–5(k)). Congress intended that the standards for awarding fees under § 1988 be the same as those under the fee provisions of the 1964 Civil Rights Act. Thus, courts interpret § 2000 e–5(k) and § 1988(b) in tandem when addressing the propriety of awarding attorney fees to a prevailing civil rights party.

The attorneys' fee statutory provisions, however, are not self-executing. The statutes do not inform the judge as to what factors are relevant to the exercise of his discretion or as to what standards to apply. Given the numerous ways in which litigation can come to an ultimate conclusion, the statutes also do not provide the judge with guidance about when a party should be considered a "prevailing party." Congress left these difficult issues for judicial interpretation.

1. *When Does a Civil Rights Party "Prevail"*

Congress has employed the legal term of art "prevailing party" in numerous statutes authorizing awards of attorneys' fees. *See, e.g.,* 42 U.S.C. § 3616(c)(2); ADA, 42 U.S.C. § 12205; Title VII, 42 U.S.C. § 2000e–5(k); 42 U.S.C. § 1988(b). On May 29, 2001, the Supreme Court defined a "prevailing party" for purposes of a fee-shifting statute as a "party in whose favor a judgment is rendered, regardless of the damages award."[2] *Buckhannon Board*

and Care Home, Inc. v. West Virginia Department of Health and Human Resources, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). To prevail, a party *must* be awarded *some relief* by a court. 121 S.Ct. at 1840 (emphasis added). This may take the form of a judgment on the merits or a court-ordered consent degree. *Id.* Both create the "material alteration of the legal relationship of the parties" which is necessary to a fee award. *Id.*

A party need not succeed on all issues in order to be deemed a "prevailing party." A party needs only to "establish his entitlement to *some relief* on the merits of his claims in the trial court or on an appeal." 121 S.Ct. at 1840. As explained by the Eleventh Circuit:

> To be a prevailing party [a] party need not prevail on all issues to justify a full award of costs, however. Usually the litigant in whose favor judgment is rendered is the prevailing party for purposes of rule 54(d) .... A party who has obtained some relief usually will be regarded as the prevailing party even though he has not sustained all his claims .... 10 *Wright & Miller, supra,* § 2667, p. 129–130. Cases from this and other circuits consistently support shifting costs if the prevailing party obtains judgment on even a fraction of the claims advanced.

*Head v. Medford,* 62 F.3d 351, 354 (11th Cir.1995) (quoting from *United States v. Mitchell,* 580 F.2d 789, 793–94 (5th Cir. 1978) (citations omitted)). Thus, the outer boundary of the term "prevailing party" is that a party must receive at least some relief on the merits of a claim before being considered a "prevailing party." *See Hew-*

---

**2.** The *Buckhannon* Court's definition of a "prevailing party" was specifically written to apply under the FHAA, 42 U.S.C. § 3613(c)(2) and ADA, 42 U.S.C. § 12205. The Supreme Court, however, noted in dicta that the "pre-

vailing party" provisions in certain other fee-shifting statutes should be interpreted consistently, and listed 42 U.S.C. § 2000e–5(k) and 42 U.S.C. § 1988.

*itt v. Helms,* 482 U.S. 755, 759—60, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987).

■ This flexible rule allows the courts to balance the concerns for encouraging vigorous enforcement of civil rights against discouraging frivolous litigation within the specific and unique context of each individual case. Accordingly, where a defendant has prevailed on the merits of some of his claims, he may be deemed a prevailing party entitled to all costs (including fees) incurred in defending the suit. Under this standard, a prevailing party can redress those rare abusive situations in which a civil rights plaintiff files a blatantly frivolous claim, and then simply dismisses those claims voluntarily to avoid a judicial determination on the merits.

### 2. *Standard Applicable to Prevailing Civil Rights Defendants*

Neither § 1988(b) nor § 2000e–5 distinguish between prevailing plaintiffs and prevailing defendants. However, the Supreme Court has developed two distinct standards—one for prevailing civil rights plaintiffs and another for prevailing civil rights defendants. Relying on Congress's intent to cast civil rights plaintiffs in the role of private attorneys general, and on the fact that attorneys' fee awards to prevailing plaintiffs are necessarily awarded against violators of federal law, the Supreme Court has held that a prevailing civil rights plaintiff should ordinarily recover his attorneys' fees unless special circumstances would render such an award unjust. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 416—18, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

A far more rigorous standard applies to fee awards to prevailing defendants in civil rights cases. A prevailing defendant may recover its attorneys' fees only where it establishes that the plaintiffs' actions were frivolous, unreasonable, or without foundation, even though the action was not brought in subjective bad faith. *See Hensley v. Eckerhart,* 461 U.S. 424, 429 n. 2, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Christiansburg Garment,* 434 U.S. at 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *Cone Corp. v. Hillsborough County,* 157 F.R.D. 533, 540 (M.D.Fla.1994). The United States Supreme Court has also made clear that a litigant's duty to avoid frivolous litigation is a continuing obligation. *Christiansburg,* 434 U.S. at 422, 98 S.Ct. 694; *Turner v. Sungard Business Systems, Inc.,* 91 F.3d 1418, 1423 (11th Cir.1996). Advocacy of a claim after it is clearly no longer tenable may subject the plaintiff to attorneys' fees even though the complaint was not initially frivolous. *Christiansburg,* 434 U.S. at 422, 98 S.Ct. 694.

The standard for awarding attorneys' fees to a prevailing defendant is a stringent one. *See Hughes v. Rowe,* 449 U.S. 5, 14, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1558 (11th Cir.1995). A case is frivolous if it is "so lacking in arguable merit as to be groundless or without foundation." *Sullivan,* 773 F.2d at 1188 (citing *Jones v. Texas Tech Univ.,* 656 F.2d 1137, 1145 (5th Cir.1981)). A court must not focus on whether the claim was ultimately successful in determining frivolity. *Id.* In applying the test, the court must remain cognizant of the Supreme Court's caution that:

[i]n applying these criteria, it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how

meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*Christiansburg,* 434 U.S. at 421—22, 98 S.Ct. 694.

■ Typical "frivolity" cases include those where summary judgment is decided in favor of the defendant or on a Fed. R.Civ.P. 41(b) motion for involuntary dismissal where the plaintiffs do not introduce any evidence in support of their claims. *See Sullivan,* 773 F.2d at 1189. A case is not frivolous where the plaintiffs provide sufficient evidence to support their claims. *Id.* Yet, where a plaintiff continues to litigate even after the claim was clearly groundless, frivolous, or unreasonable, an award of fees may be proper. *See Turner v. Sungard Business Systems, Inc.,* 91 F.3d 1418, 1423 (11th Cir.1996).

■ While the inquiry is not subject to immutable rules, the Eleventh Circuit looks to three factors in determining whether a prevailing defendant is entitled to an award of attorneys' fees: 1.) whether plaintiffs established a prima facie case; 2.) whether defendant offered to settle; and 3.) whether the action was decided on dispositive motions rather than at a trial on the merits. *See Head v. Medford,* 62 F.3d 351, 356 (11th Cir.1995); *Sullivan v. School Bd. of Pinellas County,* 773 F.2d 1182, 1189 (11th Cir.1985); *Cone,* 157 F.R.D. at 541.

In applying these three factors, the Court must remain cognizant of the definition of frivolity—whether an argument is "so lacking in arguable merit as to be groundless or without foundation." *See Sullivan,* 773 F.2d at 1188. Courts apply-

ing the three factors have been reluctant to award fees unless the plaintiffs refused to acknowledge clear precedent or asserted a claim which was based knowingly on a nonexistent interest. *See Head,* 62 F.3d at 356; *Cone,* 157 F.R.D. at 540. A defendant is not entitled to an award of attorneys' fees and costs simply because it prevailed in summary judgment. *See, e.g., Head,* 62 F.3d at 356 ("merely because plaintiff did not ultimately prevail on her federal claims does not determine that her claims were groundless"). Rigid application of these factors would lead to a result that Congress did not intend—that any defendant who prevailed on a dispositive motion would be entitled to fees.

**B. Standard for Attorney's Fees under 28 U.S.C. § 1927**

28 U.S.C. § 1927 governs counsel's liability for excessive costs. It provides as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. The word "vexatious" is not defined in the statute. In such circumstances, courts typically read statutory terms to convey their ordinary meaning. *See Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (relying on definition of "prevailing party" in Black's Law Dictionary). Black's Law Dictionary defines the term "vexatious" to mean "without reasonable or probable cause or excuse; harassing; annoying." Black's Law Dictionary 1559 (7th ed.1999). It further

defines "vexatious suit" to mean a "lawsuit instituted maliciously and without good cause." *Id.* Standard English-language dictionaries give the term similar meaning. *See, e.g.,* Webster's Third New Int'l Dictionary 2548 (3d ed.1961) (defining "vexatious" to mean "lacking justification and intended to harass"); 19 Oxford English Dictionary 596 (2d ed.1989) (defining "vexatious" for legal purposes as "[i]nstituted without sufficient grounds for the purpose of causing trouble or annoyance to the defendant").

There is little case law in the United States Court of Appeals for the Eleventh Circuit articulating the standards applicable to an award of attorneys' fees under § 1927. *Peterson v. BMI Refractories,* 124 F.3d 1386, 1395 (11th Cir.1997). Moreover, decisions from other circuits are not in agreement on the governing principles. Some circuits have held that subjective bad faith is required for an award under § 1927. *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986); *Hackman v. Valley Fair,* 932 F.2d 239, 242 (3d Cir. 1991). Other circuits have held that it is not. *See Wilson–Simmons v. Lake County Sheriff's Dep't,* 207 F.3d 818, 824 (6th Cir.2000); *Miera v. Dairyland Ins. Co.,* 143 F.3d 1337, 1342 (10th Cir.1998).

While the Eleventh Circuit has not specifically required a finding of subjective bad faith, it has stated that § 1927 allows district courts to assess attorney's fees against counsel and law firms who willfully abuse the judicial process by "conduct *tantamount* to bad faith." *Avirgan v. Hull,* 932 F.2d 1572, 1582 (11th Cir.1991) (emphasis added); *Roadway Express Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). Additionally, the Eleventh Circuit has agreed with the Ninth Circuit that "[a] finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument." *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998) (quoting *Primus Automo-*

*tive Fin. Servs., Inc. v. Batarse,* 115 F.3d 644, 649 (9th Cir.1997)). The Eleventh Circuit has also warned that "[w]hen it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest." *Avirgan,* 932 F.2d at 1582.

The purpose of § 1927 is to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs bear them. *O'Rear v. American Family Life Assurance Co. of Columbus, Inc.,* 144 F.R.D. 410, 413 (M.D.Fla.1992). Section 1927 "does not distinguish between winners and losers, or between plaintiffs and defendants.... It is concerned only with limiting the abuse of court processes." *Roadway Express,* 447 U.S. at 762, 100 S.Ct. 2455.

### C. The "Bad Faith" Standard

The American Rule prohibits fee shifting as a general rule. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). As an exception to the American Rule, however, the district court may award attorneys' fees when a losing party has "acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44—46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Alyeska Pipeline,* 421 U.S. at 258—59, 95 S.Ct. 1612; *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir.1998); *In re Mroz,* 65 F.3d 1567, 1575 (11th Cir.1995); *Kreager v. Solomon & Flanagan, P.A.,* 775 F.2d 1541, 1543 (11th Cir.1985). A federal court may exercise its *inherent power* to sanction bad faith misconduct even if that conduct could be sanctioned under a statute or procedural rule. *See Chambers,* 501 U.S. at 49—51, 111 S.Ct. 2123. However, when bad faith conduct in the course of litigation could be adequately sanctioned under the

rules, the court ordinarily should rely on the rules and not on its inherent power. *Id.*

■ The bad faith exception to the American Rule is not limited to conduct at the moment of filing, but also incorporates bad faith acts preceding and during litigation. *See* 775 F.2d at 1543. A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. *Barnes,* 158 F.3d at 1214. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order. *Barnes,* 158 F.3d at 1214. In assessing whether an award is proper under the bad faith standard, "the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case." *See Rothenberg v. Security Management Co., Inc.,* 736 F.2d 1470, 1472 (11th Cir.1984).

■ The invocation of the court's inherent power to sanction requires a finding of bad faith after the party is afforded a due process opportunity to be heard. *See Chambers,* 501 U.S. at 49, 111 S.Ct. 2123; *In re Mroz,* 65 F.3d 1567, 1575—76 (11th Cir.1995). Inherent powers must be exercised with restraint and discretion. *Barnes,* 158 F.3d at 1214. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. 501 U.S. at 44—45, 111 S.Ct. at 2132—33. *See also Amsted Indus. Inc. v. Buckeye Steel Castings Co.,* 23 F.3d 374, 377—78 (Fed.Cir.1994) (recognizing that under certain circumstances a court can award expert witness fees as a sanction pursuant to its inherent power).

## D. The Amount of an Attorney's Fee Award

Historically, the federal courts have analyzed demands for attorneys' fees pursuant to *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974). *Johnson* set forth twelve factors to be considered in calculating a fee award.[3] The United States Court of Appeals for the Eleventh Circuit has consistently refined calculation of awards of attorneys' fees to comport with decisions of the United States Supreme Court. *Norman v. Housing Authority,* 836 F.2d 1292, 1299 (11th Cir. 1988). *Norman* adopted the lodestar approach for calculating attorneys' fees. The lodestar approach presumptively incorporates the twelve factors adopted in *Johnson,* 488 F.2d 714. *Norman,* 836 F.2d at 1298–99. The Eleventh Circuit applies the lodestar approach of *Norman* in determining a reasonable attorneys' fee. *See Camden I Condominium Assoc., Inc. v. Dunkle,* 946 F.2d 768, 772 (11th Cir.1991); *see also Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Simply stated, the lodestar is the product of the number of reasonable hours expended and the reasonable hourly rate. *Burlington v. Dague,* 505 U.S. 557, 559–60, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

---

**3.** Those twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717—9.

The lodestar approach also governs the attorneys' fees analysis under fee-shifting statutes. *City of Burlington v. Dague,* 505 U.S. 557, 561–62, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (lodestar figure has become the guiding light of our fee-shifting jurisprudence). This Court therefore applies the *Norman* lodestar approach in determining the parties' request for attorneys' fees.

### 1. Reasonable Hourly Rate

■ The Court must first determine the reasonable hourly rate. *Duckworth v. Whisenant,* 97 F.3d 1393 (11th Cir.1996); *Loranger v. Stierheim,* 10 F.3d 776, 781 (11th Cir.1994); *Norman v. Housing Authority,* 836 F.2d 1292, 1299 (11th Cir. 1988). The reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services provided by lawyers of reasonably comparable skills, experience, and reputation. *Norman,* 836 F.2d at 1299. The party seeking attorneys' fees bears the burden of producing "satisfactory evidence that the requested rate is in line with prevailing market rates," which normally requires "more than the affidavit of the attorney performing the work." *Loranger,* 10 F.3d at 781, citing *Norman,* 836 F.2d at 1299. The court may consider direct evidence of rates for similar services or opinion evidence about rates. *Norman,* 836 F.2d at 1299.

The Eleventh Circuit looks to skill as the ultimate determinate of compensation level because experience and reputation are a mirror image of skill. *Norman,* 836 F.2d at 1300. Skill is evidenced by an attorneys' initial case assessment, continuing negotiation and settlement attempts, persuasiveness, and other fundamental aspects of organization and efficiency. *Norman,* 836 F.2d at 1300—1301. Organization means that counsel plans effective discovery devices and does not use them randomly or for the mere purpose of going through established routines. Effi-ciency means doing exactly what needs to be done in a minimum time. *Norman,* 836 F.2d at 1301. Legal skill, therefore, correlates to a knowledge of both trial practice and substantive law. *Norman,* 836 F.2d at 1301. Although an attorney who must familiarize himself or herself with either aspect of practice may prove exemplary as an advocate, he or she does not have a right to claim comparable skill to attorneys whose first actions are directed at the finer points of the case. *Norman,* 836 F.2d at 1301. Proficiency should yield efficiency, and the district court has ample discretion to discount the import of counsel's expertise. *Varner v. Century Finance Company, Inc.,* 738 F.2d 1143, 1149 (11th Cir.1984). No two attorneys possess the same skill, therefore the Court must look to the range provided by the evidence, and interpolate a reasonable market rate. *Norman,* 836 F.2d at 1300. In summary, the Court determines a reasonable rate by assessing the range of fees established in the marketplace, as modified by reference to an individual attorney's skill. *Norman,* 836 F.2d at 1301; *e.g., Duckworth,* 97 F.3d at 1396.

### 2. Reasonable Hours Expended

The second step in determining the lodestar is to assess the reasonable number of hours expended in the litigation. *Norman,* 836 F.2d at 1302. Inquiry into the reasonable number of hours focuses on the exercise of "billing judgment"—exclusion of those hours not reasonably billable to a client irrespective of counsel's skill, therefore the Court must deduct for redundant hours. *Norman,* 836 F.2d at 1301–02, citing *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). A court must not consider an attorney's skill at this stage as this would constitute a double penalty—the rate would first be decreased and the hours would then be lowered. *Norman,* 836 F.2d at 1301.

The fee applicant bears the burden of documenting the appropriate number of hours. *Norman,* 836 F.2d at 1303, citing *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933; *United States v. Blue Cross and Blue Shield of Florida, Inc.,* 882 F.Supp. 166, 170 (M.D.Fla.1995). Generalized statements concerning reasonableness are of little or no assistance to the Court, instead proof of the hours dedicated to litigation and any corresponding objections must be made with sufficient specificity. *Duckworth,* 97 F.3d at 1397—98; *Norman,* 836 F.2d at 1301. Throughout the calculation of the lodestar, the Court remains cognizant that it is itself an expert on the question, and may consider the request in light of its own knowledge and experience with or without the aid of witnesses as to value or hours dedicated to litigation. *Loranger,* 10 F.3d at 781; *Norman,* 836 F.2d at 1303.

### III. *APPLICATION*

#### A. Factual Background

This Court fully developed the facts in its order of September 4, 2002 granting defendants' motions for summary judgment. *See* Docket No. 129. Nevertheless, it may be useful to reiterate some of those facts and to discuss additional facts.

##### 1. *Background*

Plaintiffs are current and former employees of the Orange County Fire and Rescue Department ("FRD"), and all were firefighters at the time of the 1999 lieutenant's exam. Plaintiffs Perry, McLean, Jackson, and Hawkins are African–American, Baquero is Hispanic, and Suarez is alleged in the Complaint to be Hispanic. Suarez, Jackson, Baquero, and McLean were members of the Union when this action was commenced. The Union is the plaintiffs' exclusive bargaining agent as to Orange County.

The relevant rank structure in the FRD is Lieutenant, Engineer, and Firefighter. Prior to 1999, only Engineers were eligible to sit for an exam for the Lieutenant position. However, pursuant to a new labor agreement reached between the FRD and the Union, Firefighters for the first time became eligible to take the exam. Docket No. 36 at 2. During the labor agreement negotiations, the FRD proposed a five-year time-in-grade ("TIG") requirement for firefighters.[4] Docket No. 36 at 8. The Union expressed a preference for an eight-year TIG requirement. *Id.* Ultimately, the Board of County Commissioners adopted an eight-year TIG requirement. *Id.* at Ex. D, p. 543.

##### 2. *Development of the 1999 Lieutenant's Exam*

The firm of Burroughs and Rockhill, Inc. ("BRI") designed the lieutenant's exam. Docket No. 36 at 3. Twelve members of the FRD served as Subject Matter Experts ("SME's") to assist BRI in designing the exam. In addition, BRI formed a panel of four Lieutenants and two District Chiefs to act as SME's and to assist in constructing a job analysis. The panel comprised two African–American males, one white female, and three white males. Docket No. 36 at Ex. B. Three out of twelve SME's were African–American, and one SME was female. Docket No. 36 at 4; Ex. J. Mark Rhame, then President of the Union, also served as an SME.

The exam comprised four components. Components 1–3 consisted of a written job knowledge examination, a structured response tactical exercise, and a structured response in-basket exercise. Component 4

---

4. "Time-in-grade" refers to the specified time period that a candidate must serve in a particular grade in order to be eligible to take an exam.

was an interactive (real-time) role play exercise. Only those candidates who passed Components 1–3 could proceed to component 4.

### 3. *Exam Results and Aftermath*

On October 11 and 12, 1999, 133 candidates (including the plaintiffs) sat for components 1–3 of the lieutenant's exam. The highest scoring 60 candidates were selected to proceed to component 4. Docket No. 36 at Ex. M. The plaintiffs failed to rank among the highest 60 candidates, and accordingly, were not selected to take component 4. Docket No. 36 at 5. Based on information compiled as of December 1999, of the 133 candidates that took the exam, 59 of the 116 white candidates passed the first three components and moved on to the fourth component of the exam, one of the ten African–Americans passed, and zero out of seven Hispanics passed.[5] Docket No. 101, § IX.A., ¶ 17, at 25.

On December 23, 1999, Plaintiffs Perry filed internal grievances with the FRD, protesting the examination. See Docket No. 36 at Ex. N. The grievances were heard by a County Grievance Adjustment Board ("GAB"). For the GAB's consideration, Plaintiffs submitted a document from Paul J. Hoffman, Ph.D., a retained test consultant, that analyzed the exam's purported adverse impact. *See id.* at Ex. O. On March 28, 2000, the GAB finally denied the grievance at the third step. Perry did not pursue the grievance to the fourth step, arbitration. *See id.* at 5.

On March 3, 2000, Perry filed an EEOC charge against Orange County, contending that the lieutenant's exam was racially discriminatory. On May 12, 2000, Perry filed

an amended EEOC charge, newly alleging, *inter alia,* that Orange County "has had a historical pattern and practice of discrimination in the hiring and promotion of minorities."

In addition, on August 8, 2000, Plaintiff Jackson filed an EEOC charge against the Union, also claiming that the lieutenant's exam was racially discriminatory, but further asserting that the Union retaliated against Perry by not admitting him into the Union after Perry filed his EEOC charge. In February 2000, Perry applied for Union membership. His application was tabled initially, and was tabled again in March and April 2000. The Union finally admitted Perry the following year.

### B. Litigation History

On February 15, 2001, the plaintiffs commenced the instant action against Orange County and the Union. In May 2002, defendants moved for summary judgment. Docket Nos. 32, 62. On August 14, 2002, the district court ordered, *sua sponte,* a *Daubert* hearing to resolve concerns regarding expert opinion issues. Docket No. 110 at 1. On August 26, 2002, the Court conducted the *Daubert* hearing. Docket No. 165. The Court heard arguments from all counsel and heard testimony. *Id.* Orange County's expert witness, Dr. Gerald V. Barrett, was present, but the plaintiffs' expert, Dr. Paul Hoffman, did not appear.

On September 4, 2002, the Court rendered summary judgment in favor of the defendants on all remaining claims. Docket No. 129. On September 18, 2002, defendants timely filed motions for attorneys' fees. Docket Nos. 132, 134. On October

---

**5.** These original statistics purportedly changed after two employees' race was clarified. The Court determined that, as a matter of law, plaintiff Suarez was not Hispanic. Docket No. 129 at 7. In addition, Orange County later clarified that another candidate was erroneously classified as white and should have properly been classified as Hispanic. Docket No. 129 at 9, n. 11. Based on these corrections, 58 of the 116 whites passed and one out of seven Hispanics passed.

3, 2002, plaintiffs filed a Notice of Appeal to the Eleventh Circuit, challenging the grant of summary judgment. Docket No. 149. Thereafter, on November 5, 2002, the Court dismissed without prejudice defendants' motions for attorneys' fees, allowing defendants the right to refile after entry of a mandate by the Court of Appeals. Docket No. 158.

The Eleventh Circuit subsequently affirmed the district court's order granting summary judgment and issued a mandate [Docket No. 168], and defendants renewed their motions for attorneys' fees. Docket Nos. 173, 175. On February 23, 2004, the plaintiffs and Orange County stipulated that the hourly rates charged by Orange County's counsel, Akerman Senterfitt, were reasonable and not in dispute. The parties also agreed that Orange County did not claim that plaintiffs' counsel acted with actual malice or in subjective bad faith. Docket No. 180. On February 26, 2004, the undersigned heard oral argument on defendants' motions.

### C. Analysis

This case is so lacking in arguable merit as to be groundless or without foundation. Accordingly: 1.) Orange County is entitled to attorneys' fees, including expert fees, against the five remaining plaintiffs under 42 U.S.C. § 2000e–5(k) for pursuing a disparate impact claim against Orange County; 2.) Orange County is not entitled to fees and expenses under 28 U.S.C. § 1927; and 3.) the Union is entitled to fees and expenses against plaintiffs under 42 U.S.C. § 1988 and 42 U.S.C. § 2000e–5(k).

The *Sullivan* factors support this conclusion. The Court determined that plaintiffs failed to establish a *prima facie* case of disparate impact, discrimination, or retaliation. Hence, the first *Sullivan* factor weighs in the defendants' favor. The second *Sullivan* factor—whether the defendants offered to settle—also weighs in favor of the defendants, as defendants never offered to settle. Finally, the third *Sullivan* factor—whether the action was decided on a dispositive motion rather than at trial on the merits—also favors the defendants, as the Court rendered summary judgment to defendants on all claims.

1. *Disparate Treatment Claims Under Title VII and Section 1981 Against the Union* [6]

■ In their complaint, plaintiffs made numerous inflammatory allegations which they could not support. Specifically, the plaintiffs alleged that the Union refused to hire, promote, and train minority applicants; that the Union knew that test information was being leaked to white applicants; and that the Union played a significant role in the creation or administration of the examination. The plaintiffs, however, failed to support these conclusions. According to the collective bargaining agreement, Orange County, not the Union, was responsible for devising and administering promotional exams. Although Union president Mark Rhame served as an SME for the exam, there was no evidence that he abused his role as an SME or subverted the testing process. Sworn allegations of intentional discrimination can cause enormous damage to the reputations of those accused of such conduct. Nonetheless, the plaintiffs published these allegations only later to abandon them. Plaintiff should have known that they had no evidence to support these frivolous allegations when they originally made them.

Plaintiffs also asserted that the Union racially discriminated against minority firefighters by advocating an eight-year TIG rule and by failing to advance plaintiffs' grievance to arbitration. Rather than asserting that the Union's advocacy

---

**6.** As discussed above, the plaintiffs voluntarily dismissed this claim as to Orange County.

of an eight-year rule merely had an adverse impact upon minorities, the plaintiffs intransigently persisted in claiming that the Union's advocacy for such a rule was racially motivated. However, as the district court found under binding Eleventh Circuit precedent, no plaintiff had standing to challenge the requirement. All of the plaintiffs met the eight-year TIG requirement, and therefore could not show that they were injured by the eight-year rule. *See, e.g., Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895, 898 (5th cir.1978); *Griffin v. Dugger,* 823 F.2d 1476, 1483–84 (11th Cir.1987).

Even if the plaintiffs had standing, they failed to identify "a shred of evidence which casts doubt on [the Union's] articulated motivations for advocating the eight-year requirement." Doc. 129 at 22. These allegations were frivolous. In fact, the evidence showed that the Union supported the elimination of the requirement that only firefighters holding the rank of engineer could sit for the examination. This is significant because the elimination of this requirement greatly *increased* the number of minorities eligible to take the promotional test.

Similarly, plaintiffs failed to present any evidence that the Union was motivated by racial animus when it failed to take the plaintiffs' grievance to arbitration. Docket No. 129 at 23. Plaintiffs provided no evidence to refute Rhame's assertion that plaintiffs' counsel did no more than ask Rhame for a letter to "settle or end the case for the plaintiffs", and that counsel never asked the Union to take the plaintiffs' grievance to arbitration. In addition, the plaintiffs failed to identify any evidence controverting Rhame's testimony that he believed their grievance had little merit. Rhame testified that the grievance was

untimely since it had not been filed within ten days of the alleged contract violation, that there was no evidence of cheating or a breach in test security, and that the Union contract did not allow the Union to grieve most of the issues raised. Nor did plaintiffs refute Rhame's testimony that the Union consistently refused to challenge promotion or testing disputes, including those involving white firefighters claiming reverse discrimination. The disparate treatment claims against the Union were patently frivolous. Accordingly, the Union is entitled to an award of fees in connection with this claim.

### 2. Disparate Impact Claims Against Orange County and the Union

 In a disparate impact case, the plaintiff has the initial burden of establishing a *prima facie* case by showing that the employment practices complained of "select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Nash v. Consolidated City of Jacksonville, Duval County, Fla.,* 895 F.Supp. 1536, 1541 (M.D.Fla.1995) (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)), *aff'd,* 85 F.3d 643 (11th Cir.1996)). The plaintiffs failed to meet their burden for several reasons. The only support for their disparate impact case was the groundless opinions of Dr. Hoffman, plaintiffs' retained expert. Dr. Hoffman's opinions were unreliable, and amounted to no more than speculation. Docket No. 129 at 12–13. For example, although Hoffman opined that the passage rates of African–Americans, Hispanics, and whites were statistically significant, he produced no reliable evidence demonstrating the validity of his opinion based on the small sample size of African–Americans and Hispanics.[7] The Court also specifical-

---

7. Judge Conway also noted that Dr. Hoffman did not "take into account the potential im-
pact of failure to study." Docket No. 129 at 12. Dr. Hoffman should have investigated

ly rejected plaintiffs' attempt to group Hispanics and African–Americans together for statistical analysis purposes because they had no evidence justifying such a grouping. *Id.* at 12.

In the absence of admissible statistical evidence, plaintiffs attempted to satisfy their *prima facie* case by asserting that Orange County demonstrated a pattern of historical racial discrimination against African–Americans and Hispanics in the FRD. *Cf. Nash,* 895 F.Supp. at 1543. Plaintiffs presented no proof, however, to support their allegations of a history of racial discrimination. Docket No. 129 at 12, n. 13; *see* Exhibit 1, February 26, 2004 Hearing.[8] *See, e.g.,* Docket No. 70 at 12–13 (alleging past discrimination in hiring minority fire fighters). Although they subjectively believed unlawful discrimination occurred, they had no evidence that the 1999 lieutenant's exam selected plaintiffs in a racial pattern that was significantly different from white candidates. Docket No. 129 at 9, 12.

In their complaint, plaintiffs alleged that Orange County "created the test, in part, because of its known historical pattern and practice of discrimination in the hiring and promotion of minorities within its Fire and Rescue Department." Docket No. 1 at 23. Plaintiffs also claimed Orange County, together with the Union, "engaged in an over arching and systemic pattern and practice of race discrimination in the hiring, promotion and training opportunities for minority applicants and employees within" the FRD, including unequal training opportunities, the eight-year TIG requirement for fire fighters, the lack of a progressive education program, test answers being given to white candidates, the subjective nature of the 1999 exam, and denial of all candidates to the fourth component of the 1999 Exam. *Id.* at 24(a)-(f); *see also* 38–40; 65 (specifically incorporating 24, 38–40 into disparate impact claim (Count III)). Plaintiffs produced no evidence to support these contentions, even as they attempted to use such allegations to bolster their disparate impact case. Plaintiffs' deposition testimony, taken months before the filing of the Joint Pre–Trial Statement and the *Daubert* hearing, unambiguously revealed a complete absence of evidence of discrimination.

Another frivolous argument related to the eight-year TIG issue. The District Court determined—and the Court of Appeals affirmed—that plaintiffs did not have standing to raise disparate impact or disparate treatment claims based on the eight-year service rule. Docket Nos. 129 at 18, 168 at 5. However, the plaintiffs obstinately maintained the TIG argument even though the rule did not affect them, and unreasonably used this argument in an attempt to bolster the unsupported claims of past discrimination and Orange County's intent to "preserve the status quo of

---

plaintiffs' test preparation and other non-discriminatory factors that affected test scores. Plaintiff McLean underscores these failings and plaintiffs' unreasonable pursuit of the disparate impact claim. McLean should have been excluded from the disparate impact analysis because he did not attend an Orientation Workshop, did not request the materials from the Orientation Workshop, and did not purchase all of the study materials. Docket No. 47 at 108:10–17; 111:19–112:2; 115:11–116:2. As McLean acknowledged, he was not fully prepared, but plaintiffs charged ahead despite the obvious problems with McLean's case.

8. For example, plaintiffs filed documents assuming prior suits against the FRD in the 1990's were by minorities, when, in reality, the majority of suits were filed by white firefighters alleging reverse race discrimination. Docket No. 70 at 13. Plaintiffs subsequently conceded that several reverse discrimination lawsuits actually had been filed. Docket No. 86 (Notice of Correction and Clarification).

Whites in management positions." Docket No. 70 at 13–14.

A further example of frivolity relates to Plaintiff Suarez. In an apparent attempt to increase the statistical sampling size, plaintiffs asserted that Suarez was Hispanic. However, in his depositions, Suarez denied he is Hispanic. Instead, he stated that he was "white Brazilian" and "white non-American". Docket No. 129 at 5. Moreover, the Court specifically found that Suarez is not Hispanic as a matter of law. *Id.* at 7.

In a disparate impact case, once the plaintiff establishes a *prima facie* case, "[t]he burden then shifts to the employer to demonstrate that the tests are 'job related.'" *Albemarle Paper,* 422 U.S. at 425, 95 S.Ct. 2362 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The plaintiff then has the opportunity "to show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship,'" which would be "evidence that the employer was using its tests merely as a 'pretext' for discrimination." *Id.* at 804–05, 93 S.Ct. 1817.

Even assuming, *arguendo,* that the plaintiffs did establish a *prima facie* case, they failed, nevertheless, to carry their burden. As the Court found, Hoffman's opinions regarding the job-relatedness of the 1999 exam and alternative selection devices lacked reliability, had no basis in scientific literature, and constituted mere speculation. Docket No. 129 at 13. Plaintiffs relied on Hoffman's unreliable and speculative opinions, and as his opinions were inadmissible under *Daubert,* plaintiffs could not withstand summary judgment.

In fact, Plaintiffs knew about the deficiencies in Dr. Hoffman's opinions even *before* this lawsuit was commenced. In February and March 2000—almost one year before plaintiffs brought this action—plaintiffs had retained Dr. Hoffman as a test consultant and produced his reports in support of their internal grievance against the FRD. Orange County's GAB rejected Dr. Hoffman's opinions at that time, and no new information had been discovered afterwards. At a minimum, the GAB's decision should have put plaintiffs' counsel on notice regarding the value of Dr. Hoffman's opinions. Moreover, counsel for plaintiffs should not have uncritically relied on a central expert witness selected by lay plaintiffs. This is particularly true for claims that are incapable of proof absent strong and credible expert testimony.

Even if plaintiffs could blindly rely on Hoffman's speculative opinions at the outset of this action, it should have been clear at the close of discovery that no evidence existed to substantiate plaintiffs' assertions. With the aid of counsel, Plaintiffs should have determined during discovery that no evidentiary support existed for Hoffman's positions. Moreover, they should have become aware of Hoffman's speculation after receiving the report of Orange County's expert, Dr. Barrett, or after deposing Barrett. Plaintiffs knew that their case was only as good as their expert's opinions. However, they continued to pursue the disparate impact claim based only on Hoffman's frail opinion, and chose not to produce Hoffman to testify at the *Daubert* hearing. Therefore, the Court finds that plaintiffs' disparate impact claim against Orange County was unreasonable and without foundation, at worst, from the initial filing of the lawsuit, and at best, after discovery revealed the frivolity of their claim.

■ Regarding the disparate impact claim against the Union, Orange County, not the Union, devised and administered promotional exams. The plaintiffs pre-

sented no proof to the contrary. Therefore, plaintiffs should have known that their adverse impact claim against the Union was frivolous, groundless, or unreasonable at the time it was filed.

### 3. *Retaliation Claim Against the Union*

■ Plaintiffs alleged that the Union refused to advance their grievance to arbitration and admit plaintiff Perry to membership in order to retaliate against the plaintiffs for opposing "an unlawful employment practice" within the meaning of 42 U.S.C.2000e–3(a). However, there was no evidence that the Union had a retaliatory motive. Plaintiffs did not refute Rhame's testimony that the plaintiffs never asked the Union to advance the grievance to arbitration, and that, in any event, Rhame believed that the grievance had little merit. The evidence also showed that the Union refused to admit Perry pursuant to the Union's race-neutral policy of denying membership to employees with pending employment disputes with Orange County. The Union first tabled Perry's application in February 2000—before the March 3, 2000 filing of Perry's EEOC charge and the March 6, 2000 GAB hearing. The Union had a uniform policy of tabling such applications regardless of the applicants' race. Plaintiffs provided no evidence that the Union's non-discriminatory reasons were pretexts for discrimination. Plaintiffs' retaliation claim was frivolous.

The plaintiffs brought this action after their failed performance on the 1999 lieutenant's exam, making inflammatory allegations of intentional discrimination. Defendants Orange County and the Union have incurred substantial fees and costs in demonstrating the falsity of these meritless, groundless, and frivolous claims. Plaintiffs had numerous opportunities to realize the frivolity of their allegations, before, during, and after discovery. Yet they continued to prosecute their meritless claims, thereby unreasonably multiplying the proceedings. As a result, defendants have expended considerable time and resources, including numerous depositions, a *Daubert* hearing, and preparing summary judgment, appellate, and trial briefs. Sworn allegations of intentional discrimination can cause enormous damage to the reputations of those accused of such conduct. The plaintiffs must bear the defendants' costs in defending against this lawsuit.

### D. Reimbursement of Fees as Sanctions

■ Plaintiffs' seek attorneys' fees and expert fees against plaintiffs counsel, Thomas J. Pilacek. The Court takes seriously a request for sanctions against counsel, and is generally hesitant to impose such sanctions. Section 1927 requires a finding of conduct that is both unreasonable *and* vexatious. Here, although many of the proceedings have been multiplied unreasonably, the Court does not find that the proceedings have been multiplied vexatiously. *See Jerelds,* 194 F.Supp.2d at 1312.

Pilacek was overzealous in the prosecution of these claims, relying on unsubstantiated assertions of plaintiffs and the speculative opinions of their expert. Although counsel probably believed he had a good faith basis for pursuing plaintiffs' claims, ultimately all of the claims proved to be frivolous. However, counsel continued to pursue the disparate impact claim even after the close of discovery—the point at which he should have realized that the claim was devoid of evidentiary support. Indeed, plaintiffs voluntarily dismissed their disparate treatment claims prior to summary judgment, perhaps recognizing that those claims were meritless. However, a mere lack of merit is insufficient to trigger § 1927 sanctions; otherwise, every

such case would be sanctionable. *See McMahan v. Toto,* 256 F.3d 1120, 1129 (11th Cir.2001).

In addition, there is no evidence of vexatiousness. The primary prosecutor of this lawsuit was Gary Wilson, an associate at Pilacek's law firm. Wilson made most of the decisions in this case from commencement until May 5, 2002, when he was hired by Orange County's counsel, Kevin Shaughnessy. It is unlikely that Shaughnessy would hire Wilson to represent its clients at Ackerman Senterfitt if he believed that Wilson had conducted a lawsuit in a manner that multiplied the proceedings unreasonably and vexatiously.

Moreover, Pilacek was ultimately responsible for the actions of Wilson, and he should have closely investigated the bases of plaintiffs' claims during Wilson's tenure and upon Wilson's departure. However, unintended, inadvertent, and negligent acts will not support the imposition of § 1927 sanctions. *Jerelds,* 194 F.Supp.2d at 1312. Rather, § 1927 sanctions should be imposed only "in instances of a serious and studied disregard for the orderly processes of justice." *Id.* Finally, there is no evidence of discovery abuses, harassing conduct,[9] or evidence that counsel wilfully abused the judicial process. Accordingly, counsel is not liable for attorney's fees under § 1927 or pursuant to the Court's inherent power.

### E. Reasonableness of the Hourly Rates

#### 1. *Orange County*

■ Having determined that attorneys' fees are appropriate under § 2000e–5, the Court now turns to the issue of the appro-

priate amount of an award for attorneys' fees. Determination of a reasonable attorneys' fees award begins with the lodestar amount, which is calculated by multiplying the number of hours reasonably expended on a litigation times a reasonable hourly rate. Orange County seeks to recover $110,007.50 in attorneys' fees incurred in defending plaintiffs' disparate impact claim through the entry of summary judgment.

Orange County submitted an affidavit of its lead trial counsel, Kevin W. Shaughnessy, that itemized the total number of hours spent on all tasks and the total number of hours spent only on the disparate impact claim. Docket No. 173 at Ex. C. According to the affidavit, Orange County incurred $183,557.50 in attorneys' fees in defending all claims in this case. However, Orange County does not seek to recover the total amount. Instead, Orange County contends that fifty percent of the total number of hours expended before June 1, 2002 claim (after the disparate treatment counts were dismissed by plaintiffs) and all of the hours expended after June 1 relate to the disparate impact claim.

The rates for attorney hours range from $110 to $150 per hour, and the rate for paralegal costs is $45 per hour. Plaintiffs have agreed that the hourly rates charged by defense counsel Akerman Senterfitt for the work performed were reasonable. Docket No. 157. This Court finds that the aforementioned billing rates are reasonable based on defense counsel's high degree of skill as reflected in the record. These rates fall within the usual range of fees in the Orlando Division. The lodestar in this case is the product of the number of

---

**9.** Unsupported allegations of intentional discrimination, whether made in a complaint or other public proceedings, can do substantial damage to the individuals so accused. Plaintiffs made several provocative assertions in the complaint regarding County and Union officials and continued to claim a history or pattern and practice of discrimination within Orange County in an attempt to support their disparate impact case. This, however, falls short of conduct tantamount to bad faith.

reasonable hours expended and the reasonable hourly rates, minus the deduction based on the dismissed disparate treatment claims. This figure equals $110,007.50.

During the hearing on defendants' motions for attorneys' fees, Orange County submitted a chart summarizing the billing records and amounts attributable to the disparate impact claim. *See* Exhibit 2, February 26, 2004 Hearing. Plaintiffs did not challenge the total number of hours claimed by Orange County for the disparate treatment and disparate impact claims, but they did object to the formula used by Orange County to designate which attorney and paralegal hours were expended only on the disparate impact claim. The Court finds that Orange County's allocation and reduction of fees by fifty percent (prior to plaintiffs' dismissal of the disparate treatment claims) is an accurate and fair division with respect to the disparate impact and disparate treatments efforts. Therefore, the awarded attorneys' fees and paralegal costs should include: 1.) $93,335 (221.10 hours) in fees; and 2.) $16,672.50 (370.5 hours) in paralegal costs.

### 2. *The Union*

The parties previously stipulated that, in the event that the Union prevailed on its motion, the appropriate amount of an award of attorneys' fees was $93,743.50. When, as in this case, plaintiffs fail to challenge a prevailing defendants' affidavit stating that the hourly rates charged were their normal and customary billing rates, or fail to challenge the number of hours attested as spent on the litigation, this Court is hesitant to disregard those uncontested allegations and reduce the award requested. The Court is well aware of the range of reasonable hourly rates prevailing in the Orlando Division for similar services provided by lawyers of reasonably comparable skills and experience. Therefore, the Court approves the parties' stipulation as to the amount of fees.

██ Courts have discretion to reduce fee awards to defendants based upon a plaintiff's ability to pay. *Durrett v. Jenkins Brickyard, Inc.,* 678 F.2d 911, 915 (11th Cir.1982). Plaintiffs have not proved any such inability. Moreover, the burden of paying the Union's fees will be imposed jointly and severally on six plaintiffs. This wasteful litigation was expensive to the Union. At the hearing, counsel for the Union represented to the Court that, for the better part of two years, the Union specially assessed each of its members $2.00 per pay period to pay its legal expenses. The Union's members are entitled to a fee award as compensation for these expenditures and to deter any future frivolous litigation.

### F. Expert Witness Fees

Orange County incurred expert witness costs for Dr. Barrett in the amount of $66,578.50 and for Joyce Eastridge in the amount of $485, which was substantiated in Shaughnessy's affidavit. Based on the record, these expenses were reasonably incurred and properly awardable under Section 2000e–5(k). The fee schedule for Barrett & Associates, Inc. reflects an hourly rate for Barrett as $350 and $220 per hour for Dr. Rosanna F. Miguel, who assisted Barrett in drafting the report. Docket No. 117 at Appendix D. The fees for Eastridge resulted from her deposition testimony regarding plaintiffs' alleged economic damages. Therefore, the awarded expert fees total $67,063.50.[10]

---

**10.** Orange County does not seek double recovery for the limited expert costs already taxed in the Bill of Costs.

## IV. CONCLUSION

For the reasons set forth above, it is **RECOMMENDED** that Orange County's Renewed Motion for Attorney's Fees and for Sanctions [Docket No. 173] be **GRANTED** in part and **DENIED** in part. It is

**FURTHER RECOMMENDED** that Orange County be awarded against Booker Perry, Stacy McLean, Terry Hawkins, Robson Suarez and Juan Baquero, jointly and severally, $93,335 in attorneys' fees and $16,672.50 in paralegal fees [total of $110,007.50] for defending against the frivolous disparate impact claim. It is

**FURTHER RECOMMENDED** that Orange County be awarded against Booker Perry, Stacy McLean, Terry Hawkins, Robson Suarez and Juan Baquero, jointly and severally, $66,578.50 for the expert witness costs of Dr. Gerald V. Barrett and $485 for the expert witness costs of Joyce Eastridge. It is

**FURTHER RECOMMENDED** that Orange County's motion for sanctions against plaintiffs' counsel under 28 U.S.C. § 1927 and this Court's inherent power be **DENIED**. It is

**FURTHER RECOMMENDED** that the Union's motion for attorneys' fees [Docket No. 175] be **GRANTED**. It is

**FURTHER RECOMMENDED** that the Union be awarded $93,743.50 in attorneys' fees against Booker Perry, James Jackson, Stacy McLean, Terry Hawkins, Robert Suarez and Juan Baquero, jointly and severally.

Failure to file and serve written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02 within ten days of the date of this report and recommendation shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.

May 5, 2004.